

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

**FILED**
MAR 0 9 2017

| | |
|---|---|
| ALLEN SCHWARTZ as Attorney in Fact for Marilyn Flora, <br> Plaintiff, <br><br> vs. <br><br> MUTUAL OF OMAHA INSURANCE COMPANY, <br> Defendant. | CIV. 17-4034 <br><br> **Complaint** |

Plaintiff, for his complaint against Defendant Mutual of Omaha Insurance Company ("Mutual of Omaha"), states as follows:

### The parties

1. Marilyn Flora is a 77-year-old woman with dementia who resides in an assisted living facility in South Dakota.

2. Allen Schwartz, Marilyn's son and attorney in fact, lives in Oregon and flies to and from South Dakota to visit his mother and handle her affairs.

3. Mutual of Omaha is a corporate entity with its principal place of business outside the State of Dakota.

4. The amount in controversy exceeds $75,000.

### The policy

5. Mutual of Omaha, through a divisional office in Sioux Falls, SD, sold Marilyn Flora a long-term care insurance policy numbered 33-107272 ("the policy") on or about October 3, 2005, when Marilyn was 66 years old.

Civ:  1

6. At all times relevant to this action, Marilyn Flora paid premiums to Mutual of Omaha and was an insured policy holder under the policy.

7. Initially the monthly premiums Marilyn paid Mutual of Omaha were $152.77. By 2016, Marilyn's premiums had increased to $2,452.08 a year.

8. The policy provides various kinds of benefits, including (among other things) home health care benefits, assisted living facility benefits, and nursing home benefits.

9. According to the section entitled **Conditions for Receiving Benefits,** to be eligible for the payment of benefits, the policy holder must be "**Chronically Ill.**"

10. The policy defines the term "**Chronically Ill**" as follows:

"**Chronically Ill** means that You have been certified by a Licensed Health Care Practitioner as:

• being unable to perform, without Substantial Assistance from another person, at least two Activities of Daily Living for a period that is expected to last at least 90 consecutive days due to a loss of functional capacity; or

• requiring Substantial Supervision to protect Yourself from threats to health and safety due to a Severe Cognitive Impairment.

You will not meet the definition of Chronically Ill unless within the preceding 12-month period a Licensed Health Care Practitioner has certified that You meet such requirements."

11. A registered nurse is a "Licensed Health Care Practitioner" under the terms of the policy.

12. The policy defines the term "**Substantial Assistance**" as follows:

"**Substantial Assistance** means either Hands-on Assistance or Standby Assistance.

• Hands-on Assistance is the physical assistance of another person without which You would be unable to perform the Activities of Daily Living.

• Standby Assistance means the presence of another person, within Your arm's reach, that is necessary to prevent, by physical intervention, Your injury while You are performing the Activities of Daily Living."

13. The policy defines **"Substantial Supervision"** as follows:

**"Substantial Supervision** means continual supervision (which may include cueing by verbal prompting, gestures, or other demonstrations) by another person that is necessary to protect You from threats to Your health or safety (including, but not limited to, such threats as may result from wandering.)"

14. The policy defines **"Severe Cognitive Impairment"** as follows:

**"Severe Cognitive Impairment** means a loss or deterioration in intellectual capacity that is comparable to (and includes) Alzheimer's disease and similar forms of irreversible dementia; and is measured by clinical evidence and standardized tests that reliably measure impairment in Your:
 • short-term or long-term memory;
 • orientation as to people, places or time; and
 • deductive or abstract reasoning."

15. Under the policy, if Marilyn is determined to be **"Chronically Ill"** and meets other basic criteria (such as having the policy in force on the date care is received), Mutual of Omaha is supposed to pay benefits toward the cost of Marilyn's long-term care.

16. The policy provides a 90-day elimination period, such that for the first 90 days Marilyn resides in a long-term care facility, Mutual of Omaha will not pay benefits.

17. Every day after the first 90 days in which Marilyn is confined in a long-term care facility, the policy provides that Mutual of Omaha will pay the lesser of the daily facility charge or $132, as long as Marilyn continues to meet the conditions of the policy.

## Marilyn Flora, her illness, and her claim for benefits

18. Marilyn Flora had been a long-time caretaker for her family and the people around her. She spent her life in small town South Dakota, employed as a secretary and living a humble existence. She accumulated a modest retirement plan and paid for her own home.

19. Starting around July of 2014, Marilyn's son and daughter started to notice that Marilyn was exhibiting signs of memory loss. For example, Marilyn could not come up with the word "Kleenex" when she wanted to ask for a Kleenex tissue; she was forgetting familiar peoples' names; she could not recall a vacation only two years earlier; and she could not remember that she had had bladder cancer. Marilyn's son and daughter tried to find their mother treatment that would help her memory loss or stall its progression, but Marilyn's condition continued to worsen.

20. In February of 2015, Marilyn's daughter took Marilyn to neurologist Eugenio Matos, MD at Sanford Neurology. Dr. Matos found that Marilyn suffered from short term memory impairment, recommended that Marilyn be seen for neuropsychological testing, and asked her to return in two months after such testing.

21. In March of 2015 Marilyn was evaluated by a licensed psychologist, who collected clinical evidence; performed standardized tests to measure Marilyn's memory, orientation, and ability to reason; and reported diagnoses of "Major Neurocognitive Disorder Due to Alzheimer's…." and "Unspecified Depressive Disorder."

22. Among other tests, the psychologist administered a specific test designed to assess Marilyn's ability to live independently. The psychologist reported that the results of those tests "support a diagnosis of Alzheimer's disease/dementia" and show that "residing in an assisted living facility may better suit her needs" because of severe memory impairment, impaired overall functional living abilities, and the need for consistent caregiver support.

Civ:                                                         4

23. When Marilyn returned to see Dr. Matos later in March of 2015, Dr. Matos agreed with the psychologist's impression of "Major neurocognitive disorder" and started Marilyn on medication to try to slow the progression of her memory loss.

24. On December 16, 2015, Marilyn finally agreed to move from her home into an assisted living facility with her husband.

25. On December 18, 2015, a registered nurse in the assisted living facility reported in Marilyn's Progress Notes that Marilyn was showing signs of confusion. Marilyn claimed she had an upcoming doctor's appointment when in fact she did not, and she claimed to have been taking her anti-depressant medication daily although she had taken only one pill in 21 days. The nurse reported that Marilyn "covers up a lot for her confusion."

26. On December 24, 2015, the registered nurse reported in Marilyn's Progress Notes that Marilyn continued to need to be oriented and reminded of what was going on. She reported that Marilyn had requested that she and her husband get twin beds in their room, unaware that less than two weeks earlier she had asked for the twin beds to be removed from their room. The nurse reported that everyday Marilyn "will ask the same questions over and over, but thinks her husband has the confusion."

27. On December 31, 2015, the same nurse reported in Marilyn's Progress Notes, "Marilyn's confusion continues to be more noticeable day to day. Repeats her[self] and doesn't remember things that happened yesterday."

28. On January 26, 2016, the nurse reported in Marilyn's Progress Notes that Marilyn was confused about where some of her prescribed medication was and whether she had taken it.

29. Marilyn's son Allen submitted to Mutual of Omaha a claim for long-term care benefits for Marilyn, and he included the psychologist's report, the nurses' notes about Marilyn's

confusion and memory problems, a medical record stating that Marilyn "needs continuous care [with] medication admin – due to cognitive impairment," and some of Marilyn's other medical records.

30. On February 19, 2016, Mutual of Omaha denied Marilyn's claim, saying that Marilyn did not qualify for benefits because she did not meet the definition of "Chronically Ill." Mutual of Omaha claimed that for Marilyn to qualify, Marilyn's deterioration would have to be more severe, and denied that Marilyn needed assistance to perform at least two activities of daily living.

31. Unable to collect any long-term care benefits under her policy, Marilyn quickly exhausted her meager savings to pay for assisted living, and her only remaining financial asset was her home.

32. Meanwhile, on March 1, 2016, the registered nurse noted that Marilyn could not be relied on to attend to her personal hygiene without supervision. The nurse's Progress Note records that Marilyn had not bathed for months, had badly neglected her oral hygiene, seldom or never would change her underwear and other clothing, and would not shower on her own because she was confused about how to operate the shower.

33. Between March 1 and March 14, 2016, the nurse repeatedly noted in Marilyn's Progress Notes that Marilyn needed help with activities of daily living, including help with bathing, encouragement and supervision with dressing, and reminders to come out of her room for meals.

34. By March 17, 2016, Allen sought an internal company appeal with Mutual of Omaha of the denial of benefits.

35. To support the internal appeal, Allen submitted a letter on April 18, 2016 from Dr. Matos that confirmed Marilyn's diagnoses of dementia and depressive disorder. Dr. Matos' letter confirmed that placement in assisted living improved Marilyn's compliance with medications, her quality of life, and stability in her routine activities.

36. Along with Dr. Matos' letter, Allen submitted an updated psychological report dated February 10, 2016 from the psychologist who had tested Marilyn the year before, which reported that ten hours of additional psychological testing confirmed Marilyn's dementia. Specifically, the psychological testing showed that Marilyn's Delayed Memory Index and Immediate Memory Index were "Extremely Low," with only one-tenth of one percent (.01%) and one percent (1%) of others her age scoring worse than Marilyn on those tests, respectively. Overall, testing results ranked Marilyn's functioning in the bottom 1% to 2% of people her age.

37. Allen also informed the Mutual of Omaha claim handler that without supervision, Marilyn is in danger from not taking her medications and from being unaware of the need to take care of herself.

38. On April 18, 2016, the registered nurse caring for Marilyn noted in Marilyn's Progress Notes that staff continued to assist Marilyn with showering and personal hygiene and that staff had to put the toothpaste on Marilyn's toothbrush and encourage Marilyn to brush her teeth, as Marilyn's oral hygiene on her own was so poor she was requiring extensive dental work.

39. By November 9, 2016, Mutual of Omaha still was not paying Marilyn benefits, so Marilyn's daughter took Marilyn to Dr. Richard Whitten, a board-certified neuropsychologist at Great Plains Psychological Services in Sioux Falls for a geriatric neuropsychology evaluation, Marilyn's third round of neuropsychological testing.

40. Dr. Whitten stated that Marilyn had "ongoing cortical, Alzheimer's type process. Self-care is marginal and continued residence in an assisted living facility is necessary for her health and safety." Dr. Whitten also noted that Marilyn "is receiving *necessary* support and accommodations for her meals, medications, routine and self-care. [Emphasis added.]"

41. Dr. Whitten's report, along with his signed "APPLICATION FOR LONG TERM CARE BENEFITS TO BE COMPLETED BY THE ATTNENDING PHYSICIAN" was provided to Mutual of Omaha on December 9, 2016.

42. On December 9, 2016, the registered nurse from the assisted living facility where Marilyn was living also sent the Mutual of Omaha claims handler a copy of Marilyn's Progress Notes and a letter from the nurse stating that based on the nurse's 20 years of experience, her assessment was that Marilyn was not safe to be alone. The nurse noted several threats to Marilyn's health and safety, including concerns that Marilyn would not eat right, could not safely cook meals, would not take her medications correctly, would not bathe, and would not brush her teeth or change her own clothes without supervision.

43. By December 27, 2016 Mutual of Omaha had rejected the appeal and again denied Marilyn's claim for long-term care benefits.

44. In the meantime, Marilyn ran out of money and had to list her house for sale. She could not afford to pay for assisted living, so her two children paid for Marilyn's stay, knowing that keeping Marilyn in assisted living was necessary to provide for her health and safety.

45. To date, Mutual of Omaha has failed and refused to pay Marilyn any benefits under her policy.

### Count 1- Breach of Contract

46. Paragraphs 1 through 45 are incorporated by reference as if set forth again.

47. The insurance policy that Mutual of Omaha provided Marilyn Flora in exchange for Marilyn's payment of premiums amounted to a legally enforceable promise in the form of a contract for insurance.

48. When Mutual of Omaha failed to make payments under the policy, it breached its promise to Marilyn.

49. The breach of Mutual of Omaha's promise in the ordinary course of things caused Marilyn clearly ascertainable damages.

50. Those damages clearly ascertainable from Mutual of Omaha's breach of the contract of insurance amount to at least $36,195 to date, and continue to mount daily.

### Count 2 - Statutory Entitlement to Attorney's Fees

51. Paragraphs 1 through 49 are incorporated by reference as if set forth again.

52. Mutual of Omaha's failure to pay insurance benefits under Marilyn's insurance policy is unreasonable and vexatious, such that Marilyn is entitled under SDCL §58-12-3 to recover her reasonable attorney's fees.

53. Mutual of Omaha misrepresented its long-term care insurance policy benefits by denying payment of insurance benefits to Marilyn, even after Mutual of Omaha knew or reasonably should have known that such benefits were owed to Marilyn, while ignoring policy provisions and South Dakota law, such that Marilyn is entitled to attorney's fees under SDCL §58-33-5 and §58-33-46.1.

### Count 3 – Tortious Breach of Duty of Good Faith and Fair Dealing

54. Paragraphs 1 through 53 are incorporated by reference as if set forth again.

55. Marilyn met the definition of a policy holder who is "**Chronically Ill**" when a Licensed Health Care Practitioner certified that Marilyn required "**Substantial Supervision**" to protect herself from threats to health and safety due to a "**Severe Cognitive Impairment.**"

56. Once a Licensed Health Care Practitioner certified that Marilyn required "**Substantial Supervision**" to protect herself from threats to her health and safety due to a "**Severe Cognitive Impairment**," Marilyn qualified for policy benefits, subject to the 90-day elimination period.

57. The stated opinion of a registered nurse alone was enough to qualify Marilyn for benefits under the policy of insurance because under the policy, a registered nurse is a "Licensed Health Care Practitioner."

58. A loss or deterioration in intellectual capacity comparable to (and including) Alzheimer's disease and similar forms of irreversible dementia meets the definition of "**Severe Cognitive Impairment**" under the policy, provided the loss or deterioration is measured by clinical evidence and standardized tests that reliably measure impairment in the policy holder's memory, orientation, and deductive or abstract reasoning.

59. Nothing in the policy requires that the Alzheimer's disease or similar form of irreversible dementia must progress to a *severe* stage of dementia before the resulting loss or deterioration of intellectual capacity meets the definition of "**Severe Cognitive Impairment.**"

60. At all times since Marilyn began residing in an assisted living facility in December 2015, Marilyn has had "a loss or deterioration in intellectual capacity comparable to… Alzheimer's disease and similar forms of irreversible dementia," which was measured by clinical evidence and standardized tests that reliably measure impairment in her short-term or long-term memory, orientation as to people, places or time, and deductive or abstract reasoning.

61.     At all times since Marilyn began residing in an assisted living facility in December 2015, Marilyn has had a "**Severe Cognitive Impairment.**"

62.     At all times since Marilyn began residing in an assisted living facility in December of 2015, Marilyn has required "**Substantial Supervision**" to protect herself from threats to her health and safety due to her "**Severe Cognitive Impairment.**"

63.     The "**Substantial Supervision**" that Marilyn required to protect herself from threats to her health and safety included verbal cueing to do many things, including cueing to take her prescribed medication, bathe, eat, get dressed, and brush her teeth. Marilyn also required supervision that involved physical assistance, including helping her operate the shower and putting toothpaste on her toothbrush.

64.     Mutual of Omaha interpreted "**Severe Cognitive Impairment**" so as to artificially raise the level of impairment required for a policy holder to qualify for benefits by switching the terms "**Cognitive Impairment**" and "dementia" and pretending that a policy holder must have severe *dementia* to qualify for benefits, disregarding the fact that the policy states dementia itself *is* a "**Severe Cognitive Impairment**" and has no requirement that the dementia be "severe."

65.     For several reasons, Mutual of Omaha knew or should have known that severe *dementia* was not required for a policy holder to collect policy benefits for assisted living care, including the fact that the policy language did not state such a requirement and the fact that assisted living facilities will not accept residents with severe dementia because individuals with severe dementia require care far beyond the care offered at assisted living facilities.

66.     Mutual of Omaha recklessly disregarded the submissions related to Marilyn's claim, minimizing any weight given to information that supported Marilyn's entitlement to benefits and giving disproportionately greater weight to information that did not. For example,

Civ: 11

when an isolated medical record referred to Marilyn having a "mild impairment," Mutual of Omaha focused on that entry and disregarded everything else in Marilyn's medical records, including specifically expressed, detailed, and supported medical opinions from a psychologist, neurologist, neuropsychologist, and registered nurse confirming that Marilyn did have dementia and could not safely live alone.

67. Marilyn also met the definition of a policy holder who is "**Chronically Ill**" when a Licensed Health Care Practitioner certified that Marilyn was "unable to perform, without Substantial Assistance from another person, at least two Activities of Daily Living for a period that is expected to last at least 90 consecutive days due to a loss of functional capacity."

68. Once a Licensed Health Care Practitioner certified that Marilyn was unable to perform, without "**Substantial Assistance**" from another person, at least two Activities of Daily Living for a period that is expected to last at least 90 consecutive days due to a loss of functional capacity, Marilyn qualified for policy benefits, subject to the 90-day elimination period.

69. At all times since Marilyn began residing in an assisted living facility in December 2015, Marilyn has been unable to perform, without "**Substantial Assistance**" from another person, at least two Activities of Daily Living for a period that is expected to last at least 90 days due to a loss of functional capacity.

70. The Activities of Daily Living that Marilyn was unable to perform without either the Hands-On Assistance or Standby Assistance referred to in the policy as "**Substantial Assistance**" included bathing, dressing, and eating.

71. Mutual of Omaha fails and refuses to acknowledge that Marilyn is unable to perform at least two activities of daily living without "Substantial Assistance."

72. Mutual of Omaha has a series of deficient and unfair claim handling practices designed to reduce claim payouts at the expense of its elderly policy holders, especially policy holders suffering from dementia.

73. Those deficient claim handling practices include, but are not limited to, failing to properly apply policy provisions, intentionally applying ambiguous provisions in the company's favor instead of the insured's favor, not performing full and fair claim investigations, and not subjecting documents in the company's own file to a full and fair adjustment and adjudication.

74. Mutual of Omaha did not conduct a reasonable evaluation of Marilyn's claim.

75. Mutual of Omaha had no reasonable basis to deny the claim made on Marilyn's behalf for policy benefits or to withhold payment of benefits under the policy.

76. Mutual of Omaha knew, or through a reasonable investigation would have known, there was no reasonable basis to deny Marilyn's claim or withhold payment of Marilyn's insurance benefits.

77. Mutual of Omaha's conduct as described above breached the duty of good faith and fair dealing it owed to Marilyn as its insured.

78. Mutual of Omaha's conduct as described above caused Marilyn Flora financial harm as well as emotional upset, frustration, aggravation, distress, wasted time, annoyance, and other harms.

79. Mutual of Omaha's conduct in ignoring, misinterpreting, and misapplying its own policy provisions not only caused damage to Marilyn Flora, but also has harmed and continues to harm other policy holders by increasing Mutual of Omaha's claim denials and reducing the amounts Mutual of Omaha pays in claims, and such conduct amounts to oppression, fraud, or malice, and willful and wanton reckless disregard to the rights of policy holders, such that punitive

and exemplary damages are necessary to punish Mutual of Omaha and deter Mutual of Omaha and other insurers from employing these tactics on other policyholders.

THEREFORE, Plaintiff requests that the Court enter Judgment against the Defendant as follows:

1. Compensatory damages in an amount to be determined at trial;
2. Prejudgment interest as allowed by law;
3. Punitive damages an amount to be determined at trial;
4. Other relief as deemed appropriate and necessary, including nominal damages; and
5. Attorney's fees as allowed by law pursuant to the commission of the tort of insurance bad faith, SDCL §58-12-3 and SDCL §58-33-46.1.

Dated this 7th day of March 2017.

TURBAK LAW OFFICE, P.C.

By: Nancy J. Turbak Berry
Seamus W. Culhane
Attorneys for Plaintiffs
26 S. Broadway STE 100
Watertown, SD 57201
605-886-8361
Nancy@turbaklaw.com
Seamus@turbaklaw.com

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all the issues in this action.

Dated this 7th day of March 2017.

TURBAK LAW OFFICE, P.C.

By: Nancy J. Turbak Berry
Seamus W. Culhane

Civ:                                14